IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent/<br>    Cross-Appellant,<br><br>    v.<br><br>DARRYL WILLIAM KENNON,<br><br>    Appellant/<br>    Cross-Respondent. | No. 80813-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Darryl Kennon appeals his felony convictions for first degree burglary, four counts of felony violations of court orders, and second degree assault all with a domestic violence aggravator. Kennon alleges that he was denied the constitutionally required presumption of innocence when the trial court allowed additional security officers in the courtroom while the victim testified, that his counsel was ineffective by failing to request the instruction for the lesser included offense of third degree assault, and that the court violated his fundamental rights when it entered a lifetime prohibition of his contact with his children. The State cross appeals, asserting that the trial court erred when it declined to sentence Kennon as a persistent offender under the Persistent Offender Accountability Act (POAA), part of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW.

We conclude that the presence of three uniformed officers was neither inherently prejudicial nor an abuse of discretion and that Kennon's counsel was

Citations and pin cites are based on the Westlaw online version of the cited material.

not ineffective when they did not request an instruction for third degree assault. However, because the court provided no reason for prohibiting Kennon's contact with his children for life, we remand for the court to determine whether the infringement on Kennon's rights is reasonably necessary to protect the children from harm and, if so, to narrowly tailor the orders in duration and scope. Finally, because a sentencing court lacks the authority to ignore the mandate under the POAA, the trial court erred when it declined to impose a life sentence. We remand for resentencing.

FACTS

Darryl Kennon and Zotica Kennon[1] married in 2003 and separated in 2016. In 2017, Zotica sought domestic violence protection orders against Kennon protecting Zotica and her and Kennon's three children, K.K, 13 years old, M.K., 9 years old, and V.K., 7 years old. The court granted Zotica's request and entered a domestic violence protection order protecting Zotica and her three children. Pursuant to the order, Kennon was allowed to see his children every other Saturday. However, Zotica allowed Kennon to see the children at other times. The couple divorced in March 2018.

On April 5, 2018, Kennon came to Zotica's home, and Zotica let him in. They spoke while the children were present. Following this incident, in July 2018, Kennon pleaded guilty to violating the 2017 order. The violation resulted in four domestic violence no-contact orders, which revoked Kennon's ability to see his children. Nonetheless, Zotica allowed Kennon to continue to see the

---

[1] We refer to Zotica by her first name for clarity.

2

children, and Kennon took them on a camping trip on August 10, 2018.

On August 14, 2018, Kennon repeatedly called Zotica on the phone while she was at work, angry about her allegedly seeing someone new and concerned that she was leaving the children home alone. Zotica testified that Kennon called her "283 times." Zotica left work because she was "too nervous" and began cleaning her house. Kennon's calls continued, and Zotica called the police after she told him to stop calling her.

At around 4:00 p.m. that day, Kennon entered Zotica's apartment while the children were present. The door was open. Zotica was in her roommate's room. V.K. saw Kennon in the hallway and went out to speak with him. He asked where Zotica was, and V.K. told him. Kennon entered the roommate's room, and Zotica testified that he pushed her in the stomach. Kennon, on the other hand, testified that he "just tapped her and said, hey, you called the police on me?" They exited the bedroom and went to the kitchen. Kennon was asking Zotica "[q]uestions like, did you call the police on me?" Zotica admitted that she did, and Kennon "got upset[,] and . . . he hit her." Zotica testified that Kennon pushed her and "tried to hit [her] face with his head," but she was able to avoid the contact.

V.K. stated that, at this time, she and her siblings "all started crying" and "were telling him to stop it." Kennon pushed her, pinned her in the laundry room area, and then hit her eye "with his head." She testified that she saw "something red in [her] eye," and blood began coming from her mouth and nose. Kennon testified, "I slapped her in her face . . . with my right hand." He alleged it was an

3

open-handed slap and that he did it with his nondominant hand.

Zotica testified that Kennon told her that "he was going to kill [her]," and Zotica begged for her life, asking him not to kill her "in front of the kids." Zotica testified that he then reached into his pocket and retrieved "a sledgehammer." Kennon testified that Zotica "reached under the kitchen sink, and pulled out the hammer." Kennon testified that he raised the hammer over his head, to try to "pull[ ] it away from her." K.K. threw something at Kennon's back to try and get him to stop. And Zotica grabbed the hammer and ran out of the house to the apartment complex parking lot.

At this time, V.K. testified that she and her siblings left the house and began screaming for help because they "didn't want [their] mom to get hurt." Simultaneously, Zotica was running around a vehicle, and Kennon was chasing her. Kennon testified that he "was trying to get her to stop[,] . . . [a]nd if she would have stopped, [he] probably would have had the opportunity to apologize for hitting her in the first place." Zotica eventually dropped the hammer. She testified that Kennon picked it up and threw it at her and then was "reaching in [his] truck" for a baseball bat.

After multiple neighbors noticed the altercation and began calling the police, Kennon got into his car and, according to V.K.'s testimony, was "trying to drive away." At some point, K.K. had gone inside the house, retrieved a knife, and "was stabbing [Kennon's] [vehicle's] window shields" as Kennon drove away. Zotica believed he was trying to run her over with his truck. Zotica ran away from the apartment complex and got into the vehicle of a woman she saw driving. She

4

ended up in an office near her apartment, "[u]nder the office table" where the police found her when they responded to the scene. Zotica was transported to a nearby hospital and treated for her injuries. She sustained an orbital wall fracture. Kennon testified at trial that he had "no idea" what fractured the orbital bone in Zotica's face.

The State charged Kennon with seven domestic violence felonies: first degree burglary (count 1), four counts of felony violation of a court order (counts 2 through 5), second degree assault with a deadly weapon (count 6), and second degree assault by reckless infliction of substantial bodily harm on Zotica (count 7).

Trial began on August 7, 2019. Prior to her testimony, Zotica requested that an additional officer be present. She had "concerns for her safety" and noted that Kennon previously had an "outburst in court and [made] some sort of threats to the judge in that case." Neither the State nor the court independently verified this information. Detective Gerald Gee also had concerns about a phone call Kennon made to his sisters from jail. During the conversation, one of Kennon's sisters said, "[A]re you sure about that other thing and do you want to talk to your brother first?" The State was unsure what the conversation was in reference to but thought that it might be regarding its conversation with Kennon's brother "about potential alternatives to a life in prison sentence upon conviction." Because of this conversation, Detective Gee also asked the State if it would request an additional officer.

Based on Zotica's and Detective Gee's requests, the State asked the

court if an additional officer could be present while Zotica testified. The parties and the court agreed that "Kennon has certainly behaved in an exemplary manner during pretrial and trial proceedings." And the court noted that there were already two officers in the courtroom, "which is somewhat unusual" and that Detective Gee also would be present for some of the testimony.

Nonetheless, the trial court granted the State's request to seek an additional officer, thereby allowing three uniformed officers in the courtroom and Detective Gee in plain clothes. The court ruled: "I'm going to allow it because I have reason to believe that [Zotica] is feeling traumatized and will feel very traumatized at the time that she has to openly confront Mr. Kennon. And I think that outweighs any danger of unfair prejudice to Mr. Kennon." The court asked Kennon if he would like a limiting instruction, but Kennon declined, not wanting to draw more attention to the issue.

At one point, immediately following a recess during Zotica's testimony, a fourth uniformed officer was present in the courtroom. When defense counsel noted their presence, they requested a recess to discuss the matter outside the presence of the jury. Defense counsel noted that "there are jail officers lurking behind the prosecutor's table, and one . . . was standing about 10 feet behind defense table." Realizing that the fourth uniformed officer's presence was a mistake, the court dismissed the additional officer. The jury returned to the courtroom with the three officers and Detective Gee present.

Following testimony from Zotica, all three children, and Kennon, among other individuals and experts, the jury found Kennon guilty of first degree

6

burglary, four counts of violation of a court order, and second degree assault by reckless infliction of substantial bodily harm all with domestic violence aggravators. The jury acquitted Kennon of second degree assault with a deadly weapon.

At sentencing, the State offered two prior plea agreements, which showed Kennon's prior convictions for child molestation in the first degree and rape of a child in the first degree. Based on these convictions and Kennon's conviction for burglary in the first degree, the State argued that the trial court was required to impose a life sentence under the POAA, RCW 9.94A.570. Kennon, on the other hand, asserted that his 1991 guilty plea for first degree child molestation was facially invalid because it did not include two elements of the charged crime. He further argued that it was unfair to impose a life sentence where the POAA disproportionally sentences black men to prison for life and that he has not had any other convictions since 1992. Specifically, he argued that, as applied to Kennon, the POAA "is cruel and any cruel sentence is an unconstitutional sentence."

At first, the court concluded that it could not allow Kennon's challenge to the 1991 conviction. However, after some discussion, the court—while acknowledging that it was without authority to do so—refused to impose a life sentence under the POAA. The court stated:

> I am very troubled by the persistent offender law, particularly as it relates to this particular case. . . . I am aware though of the disproportionality of African-American men in the criminal justice system and in the life without parole population . . . . And there's no doubt in my mind that institutional racism plays a role. . . .
> The reason I feel so conflicted right now, and I do, is

7

> because I took an oath to apply the law and to enforce it, whether I agree with it or not because it's not my call. It's the legislature's call. And to a degree it's the call of appellate courts higher than my level of trial court. However, this is my judgment and sentence and I have to take some ownership of it. And a life without parole sentence, given your actions and your choices, which were really bad in this case, just still seems to me to be very disproportionate. So I'm going to do something I don't do very often. And this is going to go to the appellate court regardless of what I rule, and I know it will.
>
> . . . I am not going to count that child molestation conviction. And I am not going to count it on the basis that in your plea, you did not specifically admit to two necessary elements of the crime and we've gone over what those are.

Instead, it imposed an exceptional sentence of 176 months. The court also entered lifetime no-contact orders protecting Kennon's children and Zotica after the child advocate alleged that the children wanted the "full orders."

Kennon appeals his conviction, and the State cross appeals his sentence.

ANALYSIS

Additional Security

Kennon alleges that the trial court violated his constitutional right to a fair trial when it allowed additional officers to "lurk[ ] behind the prosecutor table" during Zotica's testimony. Because the officers' presence was not inherently prejudicial and the trial court has broad discretion to manage court proceedings, we disagree.

"The presumption of innocence is a basic component of a fair trial under our criminal justice system." State v. Gorman-Lykken, 9 Wn. App. 2d 687, 692, 446 P.3d 694 (2019). "[T]he accused is . . . entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man."

State v. Finch, 137 Wn.2d 792, 844, 975 P.2d 967 (1999). We must "closely scrutinize practices that may threaten the fairness of the trial." State v. Butler, 198 Wn. App. 484, 493, 394 P.3d 424 (2017). To this end, "[c]ourtroom security measures that single out defendants as particularly dangerous or guilty threaten their right to a fair trial because those measures erode the presumption of innocence." Gorman-Lykken, 9 Wn. App. 2d at 692. However, the presence of security at a defendant's trial does not necessarily lead to an inference that a defendant "is particularly dangerous or culpable." Holbrook v. Flynn, 475 U.S. 560, 569, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).

Furthermore, "[t]he trial court is generally in the best position to perceive and structure its own proceedings." State v. Dye, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013). In particular, "a trial court has broad discretion to make a variety of trial management decisions," including ruling on "provisions for the order and security of the courtroom." Dye, 178 Wn.2d at 547-48. "[E]ven if we disagree with the trial court" regarding its trial management decisions, "we will not reverse its decision unless that decision is 'manifestly unreasonable or based on untenable grounds or untenable reasons.'" Dye, 178 Wn.2d at 548 (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). "[W]here special courtroom procedures implicate constitutional rights, it is not the defendant's burden to prove that [they have] been prejudiced, but [it is] the prosecution's burden to prove that a special dispensation for a vulnerable witness is necessary." Dye, 178 Wn.2d at 553.

With regard to the court's decision to allow additional uniformed officers

9

during Zotica's testimony, two cases guide our analysis. In <u>Butler</u>, we held that "[t]he presence of a second jail officer in the courtroom during a portion of the victim's testimony did not deprive [the defendant] of his right to a fair trial." 198 Wn. App. at 486. Ivory Butler was charged with promoting commercial sexual abuse of a minor. <u>Butler</u>, 198 Wn. App. at 486. At trial, the victim testified. <u>Butler</u>, 198 Wn. App. at 489. During a portion of their testimony, there were two uniformed officers present: one, presumably in a customary location by or in the jury box, and one "'directly in front of the witness stand but some 20 feet away[,] . . . [and] eight feet away from the defendant.'" <u>Butler</u>, 198 Wn. App. at 489. We concluded that the second officer's presence was not prejudicial, reasoning that they were not conspicuously close to Butler, did not obstruct Butler's view of the witness, did not attract attention, and were not present for the remainder of the victim's testimony. <u>Butler</u>, 198 Wn. App. at 494. Additionally, the trial court instructed the jury that a routine change in security personnel caused the additional officer's presence. <u>Butler</u>, 198 Wn. App. at 486-87. We affirmed Butler's conviction. <u>Butler</u>, 198 Wn. App. at 495.

In <u>Gorman-Lykken</u>, the court reviewed a trial court's decision allowing a corrections officer to stand next to the defendant while he testified. 9 Wn. App. 2d at 689. James Gorman-Lykken was charged and convicted of second degree rape. <u>Gorman-Lykken</u>, 9 Wn. App. 2d at 689-90. Gorman-Lykken testified at trial during which time a corrections officer stood next to the witness stand. <u>Gorman-Lykken</u>, 9 Wn. App. 2d at 689. The trial court allowed the officer to be next to the witness stand because the officer "was 'not one of [the court's] largest

10

corrections officers" and she was the only officer in the courtroom. Gorman-Lykken, 9 Wn. App. 2d at 690.

On appeal, the court first addressed whether the officer's presence was inherently prejudicial, focusing on the particular facts of the case. Gorman-Lykken, 9 Wn. App. 2d at 694. It concluded the officer's presence and location were not inherently prejudicial because "[t]here was only one officer, and she did not do anything to draw attention to herself[, and she] moved to and from the witness box outside the presence of the jury." Gorman-Lykken, 9 Wn. App. 2d at 695.

The court next addressed whether the trial court's decision was an abuse of discretion. Gorman-Lykken, 9 Wn. App. 2d at 695-96. The court adopted a specific standard for when a trial court allows "a security officer to be stationed next to the witness stand when the defendant testifie[s]." Gorman-Lykken, 9 Wn. App. 2d at 697. It held that "the trial court must (1) state case-specific reasons for the need for such security measure, and (2) determine that the need . . . outweighs the potential prejudice." Gorman-Lykken, 9 Wn. App. 2d at 697. The court concluded that the trial court abused its discretion because it failed to provide a case-specific reason for its ruling. Gorman-Lykken, 9 Wn. App. 2d at 698.

First, we determine whether the presence of additional security officers in Kennon's case was inherently prejudicial. Three uniformed officers were present in the courtroom: one officer sat by the jury box, as is customary, one stood by the rear door, and one sat in the back of the courtroom. Despite the trial court's

11

assertion that it was odd to have even two officers present, other trial courts have noted "that sometimes one to three corrections officers [are] assigned to a defendant in court," and "[t]he routine use of security personnel in a courtroom during trial generally is not an inherently prejudicial practice." Gorman-Lykken, 9 Wn. App. 2d at 690, 693. Even if it were unusual to have three uniformed officers, their placement throughout the courtroom was not inherently prejudicial: they were not hovering around Kennon or standing next to Zotica as if protecting her. Thus, the officers' positions were inconspicuous. And although there were only two officers present during Butler's trial, the additional officer in this case does not require a conclusion distinct from Butler. Moreover, we are wary of presuming "that any use of identifiable security guards in the courtroom is inherently prejudicial." Holbrook, 425 U.S. at 569; compare Gorman-Lykken, 9 Wn. App. 2d at 696 (distinguishing the placement of a security officer by the defendant while testifying because "the potential for prejudice is greater when a security officer is stationed next to a testifying defendant than when an officer or officers merely are present elsewhere in the courtroom"). For these reasons and because the officers' positions did not single out Kennon as particularly dangerous, their presence was not inherently prejudicial. See, e.g., Holbrook, 475 U.S. at 571 ("Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings.").

Next, we adopt the second step in Gorman-Lykken, applying it more generally to hold that a trial court must provide case-specific reasoning on the

record for its decision to allow additional security measures during a defendant's trial.[2] Here, the trial court provided a case-specific justification. Specifically, when granting the State's request for additional officers, the court referenced Kennon's vague and concerning phone call to his sister, a previous courtroom outburst that led to Kennon's expulsion from the court, and the victim's real and rational fear. And "[t]rial courts have a unique perspective on the actual witness that an appellate court reviewing a cold record lacks." Dye, 178 Wn.2d at 553. Indeed, "the trial court is in the best position to analyze the actual necessity of a special dispensation." Dye, 178 Wn.2d at 553. Because the court provided a case-specific analysis, it did not abuse its discretion, did not act manifestly unreasonable, and did not base its decision on untenable grounds when it allowed additional officers to be inconspicuously placed throughout the courtroom.

Kennon disagrees and unpersuasively attempts to distinguish Butler because "the additional security in Kennon's case was not due to a routine shift change" and because "[t]he jury in Butler was told about the shift change." With regard to his first contention, the fourth officer's presence was due to a similarly innocent issue, i.e., a miscommunication between the jail security's supervisor

---

[2] The State asserts that a case-specific inquiry like Gorman-Lykken is not required when the officers are not stationed next to the defendant while they testify. Although Gorman-Lykken limited its holding to such a situation, "Washington courts have emphasized that the trial court must actually exercise discretion based on the facts of the case in considering whether to allow a courtroom security measure." 9 Wn. App. 2d at 695-96. Accordingly, we conclude that, whatever the security measure, a court must provide a reason for its determination.

and the State. As to the second contention, there was no limiting instruction in Kennon's case because he did not seek one. Although defense counsel reasonably decided not to request a jury instruction regarding the officers, the lack of an instruction does not justify concluding that the officers' presence was prejudicial or that the trial court abused its discretion.

Kennon also relies on State v. Jackson, 195 Wn.2d 841, 467 P.3d 97 (2020), to support his assertion that "there can be no doubt that the jury saw the additional security in the courtroom during Zotica's testimony." In Jackson, John Jackson Sr. had a security leg brace on during trial that was not visible under his clothes. 195 Wn.2d at 844, 847. However, when Jackson testified in his defense, he argued that the jury could see the brace, and despite his objection, the court did not require that the jail officers remove his leg brace. Jackson, 195 Wn.2d at 848. On appeal, because the State could not prove that the jury did not notice the brace, which was a more sophisticated shackle, the court concluded that the State failed to satisfy the constitutional harmless error analysis. Jackson, 195 Wn.2d at 847, 858. Jackson is distinguishable because it involved the inherently prejudicial issue of shackling. See Holbrook, 475 U.S. at 560 (holding that "[t]he conspicuous, or at least noticeable, presence of guards in a courtroom during trial is not the sort of inherently prejudicial practice that should be permitted only where justified by an essential state interest"). Thus, we are not persuaded.

### Ineffective Assistance of Counsel

Kennon next asserts that he received ineffective assistance of counsel

because his trial counsel failed to seek a jury instruction on the lesser included offense as to count seven of third degree assault by negligence. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. In re Pers. Restraint of Brett, 142 Wn.2d 868, 873, 16 P.3d 601 (2001). "Where the claim of ineffective assistance is based on counsel's failure to request a particular jury instruction, the defendant must show [they were] entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." State v. Classen, 4 Wn. App. 2d 520, 539-40, 422 P.3d 489 (2018). "Ineffective assistance of counsel is a fact-based determination that is 'generally not amenable to per se rules.'" State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting State v. Cienfuegos, 144 Wn.2d 222, 229, 25 P.3d 1101 (2001)). We review ineffective assistance claims de novo. Brett, 142 Wn.2d at 873.

*Was Kennon Entitled to the Instruction?*

First, Kennon cannot show that he was entitled to the lesser included offense instruction.

A defendant is entitled to an instruction on a lesser included offense when, among other requirements, "'there is evidence that the defendant committed only the inferior offense.'" State v. Fernandez-Medina, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (internal quotation marks omitted) (quoting State v. Peterson, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)). The evidence is sufficient where "substantial evidence in the record supports a rational inference that the

15

defendant committed only the lesser included . . . offense." Fernandez-Medina, 141 Wn.2d at 461. And we "review the supporting evidence in the light most favorable to the party [seeking] the instruction." Fernandez-Medina, 141 Wn.2d at 455-56.

Here, "[a] person is guilty of assault in the second degree if [they] . . . [i]ntentionally assault[ ] another and thereby recklessly inflict[ ] substantial bodily harm." RCW 9A.36.021(1)(a). "A person is guilty of assault in the third degree if [they], under circumstances not amounting to assault in the first or second degree[,] . . . [w]ith criminal negligence, cause[ ] bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering." RCW 9A.36.031(1)(f).

The mens rea elements for these offenses differ. As to second degree assault, the person must act with intent, i.e., "with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). The accused must also "know[ ] of and disregard[ ] a substantial risk that a wrongful act may occur and [their] disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c). With regard to third degree assault, the accused must act with criminal negligence, i.e., they "fail[ ] to be aware of a substantial risk that a wrongful act may occur and [their] failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

Kennon testified to intentionally hitting Zotica. And third degree assault is

16

justified only where the accused acts negligently. We are not persuaded by Kennon's assertion that he was unaware of the risk because he slapped Zotica with his nondominant hand. There can be no reasonable inference that Kennon's actions were merely negligent because he *intentionally assaulted Zotica.* And as this court acknowledged in State v. Loos, 14 Wn. App. 2d 748, 759, 764, 473 P.3d 1229 (2020), "the mens rea of criminal negligence is undoubtedly an inferior degree of culpability than *intent.*" Second degree and fourth degree assault require intent, whereas third degree assault does not. See Loos, 14 Wn. App. 2d at 763-65 (holding that the trial court erred in instructing the jury on fourth degree assault where the State had charged the defendant with third degree assault and concluding that fourth degree assault is neither a lesser included offense nor an inferior degree offense to third degree assault). Because Kennon admitted that he acted with intent, Kennon was not entitled to an instruction for third degree assault.

*Was Kennon's Counsel's Performance Deficient?*

Kennon also cannot overcome the presumption that counsel's performance was not deficient.

Defense counsel is not required "to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009). Indeed, counsel's conduct is presumed effective and is not deficient if it "can be characterized as legitimate trial strategy or tactics." State v. Kyllo, 166 Wn.2d 856, 862-63, 215 P.3d 177 (2009). To rebut this presumption, Kennon must

show "there is no conceivable legitimate tactic explaining counsel's performance"[3] "based on the record established in the proceedings below."[4] Kennon fails to satisfy this requirement.

Grier is instructive. There, Kristina Grier was intoxicated when a fight broke out between her and Gregory Owen. Grier, 171 Wn.2d at 21, 23. Grier shot Owen, who was later pronounced dead. Grier, 171 Wn.2d at 23-25. The State charged Grier with second degree murder with a firearm sentencing enhancement. Grier, 171 Wn.2d at 25. Following a discussion with Grier, her counsel withdrew the lesser included offense instructions for manslaughter in the first and second degree. Grier, 171 Wn.2d at 26-27. Because Grier's attorney asserted that Grier was not armed with a weapon when Owen was shot, "Grier and her defense counsel reasonably could have believed that an all or nothing strategy was the best approach to achieve an outright acquittal." Grier, 171 Wn.2d at 42-43. Our Supreme Court held that the court must assume "that the jury would not have convicted Grier of [the greater offense] unless the State had met its burden of proof" and that "the availability of a compromise verdict would not have changed the outcome of Grier's trial." Grier, 171 Wn.2d at 43-44. The court concluded that Grier could not meet her burden of proving her counsel's performance was deficient because "[t]hat this strategy ultimately proved unsuccessful is immaterial to an assessment of defense counsel's initial calculus." Grier, 171 Wn.2d at 43.

---

[3] State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).
[4] Classen, 4 Wn. App. 2d at 535.

Here, as discussed above, Kennon fails to establish that he was entitled to the third degree assault instruction. And counsel is not ineffective where they withdraw an instruction "of what [they] believed was a claim doomed to fail." See Knowles, 556 U.S. at 124-26 (holding that defense counsel was not ineffective where they withdrew a not guilty by reason of insanity instruction, where counsel believed they had no evidence to prove insanity). Based on the record, Kennon's counsel likely chose not to request the instruction because Kennon's theory admitted that he intentionally hit Zotica, precluding the validity of a claim that he committed third degree assault by criminal negligence. Furthermore, counsel requested an inferior degree offense instruction for fourth degree assault, which invokes the mens rea that Kennon admitted to, i.e., intent. Thus, Kennon fails to rebut the strong presumption that his counsel was effective as well as the related Grier presumptions. His ineffective assistance of counsel claim is without merit.

Kennon asserts that "Grier and [In re Pers. Restraint of ]Crace[, 174 Wn.2d 835, 280 P.3d 1102 (2012),] should not be read to categorically preclude prejudice in the context of an ineffective assistance claim involving [a] lesser offense instruction." Grier and Crace do not create a categorical exclusion. However, they do create presumptions that (1) the State met its burden of proof to convict the defendant of the greater offense and (2) the outcome of trial would not be different had the court supplied a lesser included offense instruction. In Grier, our Supreme Court created the two presumptions regarding ineffective assistance of counsel claims and lesser included offenses, 171 Wn.2d at 43-44, and, in Crace, our Supreme Court applied Grier's presumption to a similar

scenario. There, Hoyt Crace challenged his trial counsel's decision not to request the lesser included offense for second degree assault with a deadly weapon, i.e., unlawful display of a deadly weapon. Crace, 174 Wn.2d at 838-39. And the court concluded that his claim failed. Crace, 174 Wn.2d at 838-39, 848. Although Kennon's argument sees support from the Ninth Circuit Court of Appeals in Crace v. Herzog,[5] our Supreme Court precedent binds us. See, e.g., W.H. v. Olympia Sch. Dist., 195 Wn.2d 779, 788, 465 P.3d 322 (2020) (holding that, where there was "no reason to overturn" precedent, it binds the court's decision via "stare decisis"). Therefore, the Grier presumptions apply.

Fundamental Right To Parent

Kennon contends that the court's orders prohibiting his contact with his children violated his fundamental right to parent. Because the sentencing court did not provide an explanation for the scope or duration of the orders, we agree and remand for the court to address the parameters of the no-contact orders under the reasonably necessary standard.

"Parents have a fundamental liberty interest in the care, custody, and control of their children." State v. Ancira, 107 Wn. App. 650, 653, 27 P.3d 1246 (2001). "That right cannot be abridged without due process of law." In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992); Ancira, 107 Wn. App. at 653. Nonetheless, a trial court may impose crime-related sentencing

---

[5] 798 F.3d 840, 847 (9th Cir. 2015) (holding that "[t]he Washington Supreme Court's methodology is a patently unreasonable application of Strickland[ v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))]."

conditions that limit a parent's rights. See In re Pers. Restraint of Rainey, 168 Wn.2d 367, 380, 229 P.3d 686 (2010) (affirming the scope of a sentencing condition, which prohibited the defendant's contact with his child); RCW 9.94A.505(9). Sentencing "'[c]onditions that interfere with fundamental rights,'" like a parent's rights regarding their children, "must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" Rainey, 168 Wn.2d at 377 (alteration in original) (quoting State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)). "We generally review sentencing conditions for abuse of discretion." Rainey, 168 Wn.2d at 374. "But we more carefully review conditions that interfere with a fundamental constitutional right, such as the fundamental right to the care, custody, and companionship of one's children." Rainey, 168 Wn.2d at 374 (citation omitted).

In Rainey, our Supreme Court addressed a lifetime no-contact order that prevented Shawn Rainey from contacting his daughter. 168 Wn.2d at 370. A jury had convicted Rainey of first degree kidnapping after he disappeared with his daughter, L.R., taking her to Mexico. Rainey, 168 Wn.2d at 371. On appeal, the court concluded that, "on the facts of [Rainey's] case," the State's interests in protecting (1) L.R.'s mother from Rainey's harassment, (2) L.R. from witnessing domestic violence between her parents, and (3) the victim of a crime, L.R., from future harm by the defendant are compelling and support the trial court's decision to prohibit Rainey's contact with L.R. Rainey, 168 Wn.2d at 377, 379. Nonetheless, the court struck the no-contact order and remanded for

21

resentencing. Rainey, 168 Wn.2d at 381-82. It reasoned that "[t]he sentencing court in this case provided no reason for the duration of the no-contact order" and the "fact-specific nature of the inquiry" into a no-contact order's duration requires the sentencing court to "address the parameters of the no-contact order under the 'reasonably necessary' standard." Rainey, 168 Wn.2d at 381-82.

Here, like in Rainey, the court failed to provide any justification for the scope and the duration of the sentencing conditions prohibiting Kennon's contact with his children. That is, the court provided no explanation, though it entered the orders following the children's advocate's statement that "the children would like the full orders in place." Indeed, the State concedes that the trial court failed to provide the required justification. Because the court failed to address the need for and duration of the no-contact orders, the trial court erred.[6] See State v. Torres, 198 Wn. App. 685, 690, 393 P.3d 894 (2017) (holding that, where the trial court did not analyze the need for a no-contact order against a parent regarding their child, the trial court abused its discretion). On remand, the court must: (1) address whether the no-contact orders "remain[ ] reasonably necessary in light of the State's interests in protecting" K.K., M.K., and V.K. from harm, (2) if they are, then the court must narrowly tailor the orders, "both in terms of scope and duration," and (3) the court should consider less restrictive alternatives when

---

[6] Kennon also asserts that the trial court erred when it imposed Department of Corrections' supervision fees. But as discussed below, the trial court erred when it failed to apply the POAA and impose a life sentence. And "no offender subject to [the POAA] may be eligible for community custody." RCW 9.94A.570. Therefore, the issue is moot.

it comes to the orders' scopes and duration.[7]

POAA

In its cross appeal, the State contends that the trial court erred when it failed to impose a life sentence under the POAA. Because the trial court erred when it allowed Kennon to attack his prior conviction and lacked discretion under the POAA, we agree.

Under the POAA, "a persistent offender shall be sentenced to a term of total confinement for life without the possibility of release." RCW 9.94A.570. And a persistent offender is a defendant who has been convicted of a most serious offense and (1) has two prior felonies that also are most serious offenses or (2) has been convicted of rape of a child in the first degree, or child molestation in the first degree. RCW 9.94A.030(37). A "most serious offense" means any class A felony. RCW 9.94A.030(32)(a). "Burglary in the first degree is a class A felony." RCW 9A.52.020(2).

Applicable here, the jury convicted Kennon of burglary in the first degree with the domestic violence aggravator. In addition, the State provided proof—copies of the plea agreements—that Kennon pleaded guilty to (1) child molestation in the first degree in 1991 (1991 conviction) and (2) rape of a child in the first degree in 1992 (1992 conviction). In sum, Kennon has been convicted of one most serious offense, first degree child rape, and first degree child molestation.

---

[7] If the trial court decides that the no-contact orders are not appropriate and allows the children to visit Kennon, the court also should review the no-contact order protecting Zotica to accommodate any changes.

The court originally found that the State satisfied its burden of proving both prior convictions exist by a preponderance of the evidence. However, after Kennon's arguments regarding racial injustices wrought by the application of the POAA, the court allowed Kennon to collaterally attack the 1991 conviction because the plea agreement did not include two elements of the crime of child molestation.

Our Supreme Court rejected a similar challenge in State v. Ammons, 105 Wn.2d 175, 189, 713 P.2d 719, 718 P.2d 796 (1986). Specifically, one of the defendants in a multidefendant appeal challenged the validity of his guilty plea because it "failed to set forth the elements of the" charged crime. Ammons, 105 Wn.2d at 189. The court concluded that "[t]he defendant has no right to contest a prior conviction at a subsequent sentencing." Ammons, 105 Wn.2d at 188. Kennon's counsel on appeal "is unable to meaningfully distinguish Ammons." And because Kennon challenged the validity of his guilty plea for the same reason the defendant in Ammons did, Ammons controls. Thus, the court should not have permitted Kennon to attack the validity of the 1991 plea, and the trial court erred in disregarding the 1991 conviction. Because Kennon's prior convictions and his current conviction constitute serious offenses, under the plain meaning of the POAA, Kennon is a persistent offender subject to mandatory life imprisonment. The court erred when it chose not to order the sentence that the POAA mandates.

While Kennon admits that the POAA dictates a mandatory sentence of life, he contends that life without the possibility of parole "constitutes cruel

punishment because it disproportionally impacts Black people."[8]  "The Eighth Amendment [to the United States Constitution] bars cruel and unusual punishment while article I, section 14 [to the Washington Constitution] bars cruel punishment."  State v. Witherspoon, 180 Wn.2d 875, 887, 329 P.3d 888 (2014).  Accordingly, article I, section 14 is more protective than the Eighth Amendment.  State v. Moretti, 193 Wn.2d 809, 820, 446 P.3d 609 (2019).  "We have continually upheld sentences imposed under the POAA as constitutional and not cruel under article I, section 14" of the Washington Constitution.  Moretti, 193 Wn.2d at 820; see also Witherspoon, 180 Wn.2d at 889 (holding that the defendant's life sentence under the POAA was not cruel and unusual punishment).

With regard to his contention that the POAA constitutes cruel punishment, Kennon cites our Supreme Court's decision in State v. Gregory, 192 Wn.2d 1, 23-24, 427 P.3d 621 (2018), in which the court held that the state's death penalty was unconstitutional as administered.  The court concluded that, because the death penalty was imposed in an arbitrary and racially biased manner, the State's "capital punishment law lacks 'fundamental fairness' and thus violates article I, section 14" of the state constitution.  Gregory, 192 Wn.2d at 24.  Although Gregory applied only to the administration of the death penalty,

---

[8] Kennon also asserts that it is cruel and unusual because "there is a large gap in time between [his] current offenses and his prior strike offenses."  But Kennon fails to acknowledge that he spent a portion of the time following his 1992 conviction in jail.  Specifically, Kennon was sentenced to 102 months.  Whether he spent that entire time in custody or not, the amount of time between convictions is not a basis to conclude that the POAA constitutes cruel and unusual punishment.

Kennon's reliance on its analysis is not completely misplaced. Indeed, Justice Yu has questioned the validity of the POAA based on the principles set forth in Gregory.[9]

To this end, there is substantial evidence that the POAA applies to men of color at alarmingly disproportionate rates.[10] Unfortunately, this disproportionality is the result of the systemic racial injustices *throughout* our criminal justice system: men of color are disproportionally stopped, arrested, charged, and convicted of crimes, which lead to a disproportionate number of black men with three most serious offenses.[11] But our Supreme Court has concluded that the

---

[9] See Moretti, 193 Wn.2d at 840 (Yu, J., concurring) ("We should not be satisfied with the status quo; permanent incarceration has neither reduced crime nor increased confidence in our criminal justice system. The principles set forth in Gregory compel us to ask the same questions about a life sentence without the possibility of parole. Is it fairly applied? Is there a disproportionate impact on minority populations? Are there state constitutional limitations to such a sentence?").

[10] See STATE OF WASH. SENTENCING GUIDELINES COMM'N, TWO-STRIKES AND THREE-STRIKES: PERSISTENT OFFENDER SENTENCING IN WASHINGTON STATE THROUGH JUNE 2008, at 10 (Feb. 2009) (Out of the 314 persistent offenders sentenced under the POAA up to 2008, 127 were black.), http://www.cfc.wa.gov/PublicationSentencing/PersistentOffender/Persistent_Offender_asof20080630.pdf [https://perma.cc/7AFY-C7KH]; see also Florangela Davila, *State 'Three Strikes' Law Hits Blacks Disproportionately,* SEATTLE TIMES (Feb. 18, 2002) (The Sentencing Guidelines Commission report "shows blacks make up 3 percent of the statewide population but 37 percent of the state's three-strike lifers."), https://archive.seattletimes.com/archive/?date=20020218&slug=sentencing18m [https://perma.cc/B6B5-LT3A].

The State describes Kennon's assertion that the POAA has a disproportionate impact on black people as simplistic and conclusory. To the contrary, it is widely recognized as fact that three strikes laws like the POAA have disproportionate impacts on black people.

[11] See, e.g., Davila, supra ("Young black males are more likely to be sentenced to prison; they are more likely to be sentenced and incarcerated for drug offenses; and they are more likely to be arrested for violent and property crimes than are their white counterparts."); see also ASHLEY NELLIS, SENTENCING

POAA does not constitute cruel and unusual punishment.  See Moretti, 193 Wn.2d at 820 (noting that Washington courts have continually upheld sentences under the POAA, holding that life sentences under the POAA are not cruel). Furthermore, unlike the death penalty, the POAA is not arbitrarily imposed because it provides no discretion to the trial court.  RCW 9.94A.570 ("A persistent offender *shall* be" sentenced to life in prison without the probability of parole. (emphasis added)).

Although Kennon presents evidence on appeal that supports a conclusion that the POAA disproportionally affects men of color, particularly black men, he provided information unlike the thorough study commissioned by the defendant in Gregory.  In Gregory, the studies provided evidence to support "a clear showing that the rule is incorrect and harmful."  192 Wn.2d at 34.  Gregory's studies provided evidence on the effect of race and the imposition of the death penalty that was updated, exhaustively vetted, and subjected to review by a Supreme Court commissioner.  192 Wn.2d at 12-13.  Kennon has not presented a similar study.  We are unable to reach a conclusion contrary to the Supreme Court's in Moretti without thorough data that is sufficiently vetted.

It is in the purview of the legislature to amend or abolish the POAA.  See,

---

PROJECT, THE COLOR OF JUSTICE: RACIAL AND ETHNIC DISPARITY IN STATE PRISONS 10 (Jun. 14, 2016) ("Still other research finds that prosecutorial charging decisions play out unequally when viewed by race, placing blacks at a disadvantage to whites.  Prosecutors are more likely to charge black defendants under state habitual offender laws than similarly situated white defendants."), https://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in-state-prisons/ [https://perma.cc/8WM8-GW7X].

e.g., Moretti, 193 Wn.2d at 830 ("Regardless of any personal opinions as to the wisdom of this statute, we have 'long deferred to the legislative judgment that repeat offenders may face an enhanced penalty because of their recidivism.'" (quoting State v. Fain, 94 Wn.2d 387, 390-91, 402, 617 P.2d 720 (1980))); see also RCW 9.94A.728, official notes (listing the legislature's amendments to the POAA).

For the foregoing reasons and based on the record before us, we cannot revisit this issue.

Statement of Additional Grounds for Review (SAG)

In his SAG, Kennon alleges that "the court failed to recognize that there was no probable cause for the felony violation of a no-contact order convictions" and that his trial counsel erred when it stipulated that he had "two prior convictions necessary to elevate or even file charges for felony violation of no-contact orders."[12]  He asserts that "[t]he stipulation entered into by his lawyer was based on inaccurate, mistaken and false information."  In so asserting, Kennon attempts to attack his previous convictions for violation of no-contact orders. Specifically, he asserts that there is exculpatory information including that he had a key to the apartment and that he was invited.  However, Kennon cannot attack the validity of his prior convictions.  See Ammons, 105 Wn.2d at 188 (concluding that a defendant cannot attack a prior conviction at a subsequent sentencing). Therefore, this assertion fails.

Kennon also contends that he was subject to double jeopardy when the

---

[12] (Capitalization omitted.)

jury convicted him of four counts of felony violation of a court order. "The double jeopardy provisions of the state and federal constitutions protect against (1) a second prosecution for the same offense after an acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." State v. Robinson, 8 Wn. App. 2d 629, 638, 439 P.3d 710 (2019). "'When a person is charged with multiple counts of the same offense, each count must be based on a separate and distinct criminal act.'" State v. Madden, 16 Wn. App. 2d 327, 332, 480 P.3d 1154 (2021) (internal quotation marks omitted) (quoting Robinson, 8 Wn. App. 2d at 638). Here, it is clear that Kennon was not subject to double jeopardy because each conviction rested on separate and distinct contact. Kennon was charged and convicted of one count each of violation of a court order for his contact with Zotica, K.K., M.K., and V.K. on August 14, 2018. Therefore, Kennon's contention is without merit.

Finally, Kennon cites information on the systemic prosecution, conviction, and oversentencing of black males. As discussed above, we must acknowledge the validity of these injustices in reaching the issue of Kennon's sentence under the POAA. Nonetheless, this information does not provide a basis to overturn Kennon's conviction, and there are no other legal bases to do so.

We remand for resentencing.

WE CONCUR:

State v. Kennon, No. 80813-3-I

Dwyer, J. (concurring)—I agree with the resolution of the issues addressed in the majority opinion. I write separately because I would deny the claim of ineffective assistance of counsel on a different basis.

In order to establish ineffective assistance of counsel, a defendant must establish both that the defense attorney's performance was deficient and that the deficiency prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). "Where the claim of ineffective assistance is based upon counsel's failure to request a particular jury instruction, the defendant must show he was entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." State v. Thompson, 169 Wn. App. 436, 495, 290 P.3d 996 (2012) (citing State v. Johnston, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007)).

In Strickland itself—the seminal opinion in ineffective assistance of counsel jurisprudence—the Supreme Court explicitly defined the type of prejudice that must be shown to satisfy its requirements.

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The

1

assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially *applying the standards that govern the decision*. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.

Strickland, 466 U.S. at 694-95 (emphasis added).

Here, upon Kennon's request, the court issued an inferior degree instruction regarding assault in the fourth degree. The instruction given included the following sentence, mirroring Washington Pattern Jury Instruction 4.11:[1]

If, after full and careful deliberation on these charges, you are not satisfied beyond a reasonable doubt that the defendant is guilty, *then* you will consider whether the defendant is guilty of the lesser crime.

Jury Instruction 27 (emphasis added). Thus, as properly instructed, the jury had no occasion to consider a lesser included offense instruction if it found the defendant guilty of the greater offense.

Accordingly, had Kennon's counsel requested an inferior degree instruction regarding assault in the third degree, instruction 27 would have controlled the jury's deliberative process. Because the jury *did* unanimously determine that Kennon was guilty of assault in the second degree, we know that it would never have considered whether he was guilty of assault in the third degree, even if an instruction regarding that crime had been requested and granted. We say this because ineffective assistance of counsel jurisprudence conclusively presumes that the jury follows its instructions on the law. Strickland, 466 U.S. at 694.

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.11 (4th ed. 2016).

2

Our Supreme Court previously explained as much in State v. Grier, 171 Wn.2d 17, 246 P.3d 1260 (2011), in which it determined that a defendant could not establish that a failure to request a lesser included offense instruction on manslaughter caused her prejudice.

> Had the Court of Appeals instead assumed the jury would follow the law by convicting Grier of second degree murder only where the State had proved each of the required elements beyond a reasonable doubt, it would not have found that the absence of a manslaughter instruction led to an erroneous conviction. Indeed, the proposed manslaughter instructions instructed the jury not to consider manslaughter if convinced beyond a reasonable doubt that Grier was guilty of second degree murder. . . . ("If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crimes of Manslaughter in the First Degree or Manslaughter in the Second Degree."). Because the jury returned a guilty verdict, we must presume that the jury found Grier guilty beyond a reasonable doubt of second degree murder.

Grier, 171 Wn.2d at 41. The court reemphasized this point later in its opinion.

> Nor can Grier establish prejudice under the second prong of Strickland. Assuming, as this court must, that the jury would not have convicted Grier of second degree murder unless the State had met its burden of proof, the availability of a compromise verdict would not have changed the outcome of Grier's trial. See Strickland, 466 U.S. at 694 ("a court should presume . . . that the judge or jury acted according to law"); Autrey [v. State], 700 N.E.2d [1140], 1142 [(Ind. 1998)] (availability of manslaughter would not have affected outcome where jury found defendant guilty of murder beyond reasonable doubt).

Grier, 171 Wn.2d at 43-44.

The Grier decision was later followed and correctly applied by the court in In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012).

Kennon, however, contends that Grier was wrongly decided. This is so, he asserts, because two Ninth Circuit judges joined in a majority opinion that

3

criticized Grier on the basis that "a jury—even one following the law to the letter—might reach a different verdict when presented with additional options." Crace v. Herzog, 798 F.3d 840, 848 n.3 (9th Cir. 2015).[2]  In so observing, the federal circuit court panel does not demonstrate a command of Washington law. As Grier notes, a jury that unanimously finds guilt on the greater offense has no further opportunity to reach a different verdict.  Here, the jury, by unanimous agreement, found Kennon guilty of assault in the second degree—the greater offense—beyond a reasonable doubt.  Consistent with its instructions, it would never have considered the option of assault in the third degree.  Kennon cannot show that he was prejudiced by the absence of an instruction on an option the jury would never have considered.

I would resolve the ineffective assistance of counsel claim on this basis. In all other respects, I join in the majority opinion.

_____

---

[2] There is nothing controlling about a Ninth Circuit opinion—even one dealing with federal constitutional law.  Instead, we have significant latitude when analyzing the decisions of the various federal appellate courts. "[T]he geographical location of the court issuing the opinion is of no moment. 'We have never held that an opinion from the Ninth Circuit is more or less persuasive than, for example, the Second, Sixth, Seventh, Eighth, or Tenth Circuits.'  In re Pers. Restraint of Markel, 154 Wn.2d 262, 271 n.4, 111 P.3d 249 (2005).  Thus, we are properly guided by the principles of law announced in the most well-reasoned of the decisions we have reviewed.  We are not, however, bound to follow a holding of a lower federal court merely because it was announced as such." S.S. v. Alexander, 143 Wn. App. 75, 92-93, 177 P.3d 724 (2008).